1

2

3

4

5

6

7

8                              IN THE UNITED STATES DISTRICT COURT

9                           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CLARENCE O. SMITH,

11              Plaintiff,                    No. CIV S-02-1473 LKK GGH P

12         vs.

13   M. R. MALDONADO, et al.,

14              Defendants.                   FINDINGS AND RECOMMENDATIONS
                                  /
15   _____

16   Introduction

17              Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. §

18   1983.  Pending before the court is defendants' September 16, 2005, re-noticed motion for

19   summary judgment and supplemental motion for summary judgment,[1] to which plaintiff filed an

20   opposition to which defendants filed their reply.[2]

21   \\\\\

22

23         [1] The summary judgment motion was initially filed on May 21, 2004, and the
     supplemental motion for summary judgment was filed on January 25, 2005; both motions were
24   vacated without prejudice to re-filing, once inmate Stringfellow's central and medical files had
     been produced.  See Orders, filed on December 2, 2004, and on June 22, 2005.
25
           [2] Plaintiff's response to defendants' reply must be stricken as such a filing is
26   contemplated neither by the Federal Rules of Civil Procedure or the Local Rules.

1

Underlying Allegations

The court has previously set forth the allegations of plaintiff's complaint.[3]

Plaintiff, who was 74 years old at the time of the events described in his complaint, filed on July 8, 2002, names as defendants: M. R. Maldonado, M. B. Scharosch, Dr. Bulanon, W.D. Pannel, J. Arthur, J. Silva, E.A. Reyes, Linda L. Rianda, and Mike Knowles. Plaintiff alleges that, on December 4, 2001, his cellmate was unexpectedly ordered to be transferred and was gone by the next morning. Complaint, ¶ 15. On the afternoon (apparently of December 5, 2001),[4] plaintiff approached the building clerk of C building as well as defendant Maldonado, explaining that he needed a compatible, mature, non-smoking cellmate, who preferably did not snore. Id, ¶ 16. Defendant Maldonado replied: "Well, you can't always get what you want." Id, ¶ 17. Plaintiff arranged for the temporary placement of a compatible cellmate, inmate Comer, via the 13 building clerk, Jason Covert, filling out the requisite paperwork that day. Id, ¶ 18. Plaintiff later learned that defendant Maldonado asked inmate Robert Stringfellow whether he smoked in the cells and was twice informed by Stringfellow that he did. Id, ¶ 19. Notwithstanding, defendant Maldonado sent Stringfellow instead of Comer to plaintiff's cell. Id.

On the morning of December 6, 2001,[5] when plaintiff informed defendant Scharosch that inmate Stringfellow should be moved to another cell because plaintiff believed that inmate Jason Comer had been approved for transfer, defendant Scharosch refused to change the placement, saying "I am not making any convenience moves," despite having been informed that Stringfellow was a heavy smoker who snored loudly. Id, ¶ 20. Plaintiff is elderly and needs his sleep; smoking gags and strangles his throat and lungs and smoking is not permitted in the cells. Id. Defendant Scharosch refused to relent despite being approached by another inmate who was a building "MAC Rep," inmate Mike Shanks, on plaintiff's behalf. Id, ¶ 21.

---

[3] The complaint was modified by an Order, filed on January 8, 2003 (adopting Findings and Recommendations, filed on September 25, 2002), dismissing with prejudice Mule Creek State Prison as a defendant.

[4] It appears that it was the afternoon of December 4, 2001, when plaintiff approached defendant Maldonado and another officer about his requests as to a new cellmate.

[5] Plaintiff appears to be somewhat confused on the timing of events leading up to the attack he suffered, as he later states that that occurred on December 5, 2001and the early morning hours of December 6, 2001, which appears to comport with exhibits he attaches as well as to defendants' Answer. See Exhibits to Complaint; Answer.

Inmate Stringfellow had a history of disciplinary problems of which staff was aware, including smoking infractions. Id, ¶ 22. Stringfellow had been in administrative segregation for his disciplinary infractions just prior to being placed with plaintiff and his attitude was known to staff. Id. Defendants Maldonado and Scharosch were deliberately indifferent to plaintiff's respectful requests for a compatible cellmate who would abide by the rules. Id. Plaintiff was subjected to a horrific two to two-and-one-half hour attack by a maniacal Stringfellow on December 6, 2001 in the very early hours, during which he attempted to strangle plaintiff and succeeded in biting through plaintiff's upper lip, jaw and neck/chest area. Id, ¶¶ 23, 32. Stringfellow stated: "You just don't get it do, you? Look into my eyes. I'm 666!" and was overheard by another inmate as saying, "I'm going to take you out. I'm going to bite off and eat chunks off you!" Id.

Once an extraction team finally removed Stringfellow from plaintiff's cell, Stringfellow violently attacked and fought the five correctional officers, injuring some. Id, ¶¶ 24-25, 29.

Plaintiff was escorted in handcuffs to a holding tank in the infirmary and, only after several hours of suffering severe pain in the isolated cell was he seen by defendant Dr. Bulanon who did nothing but administer two Motrin for pain. Id, ¶¶ 29-30. In February, 2002 a Dr. Busi (not a defendant) did order x-rays of plaintiff's upper torso, but plaintiff never learned the results of the x-rays. Id, ¶ 30. Plaintiff felt the injuries he had sustained were life-threatening to a 74-year-old man and felt he had suffered a stroke which paralyzed his left upper torso. Id, ¶¶ 31-32. Plaintiff suffered chest pain, believes he had fractured ribs and suffered weakness of the right side of his upper torso, making it difficult to drink a cup of coffee. Id, ¶ 32. The injuries to his jaw, lip, chin and chest cause plaintiff much pain and discomfort. Id.

Plaintiff who has been incarcerated for thirty years has a virtually disciplinary-free prison record, was in relatively good health, comes from a long-lived family and anticipated being able to work for five years before retirement, prior to the prolonged and debilitating attack. Id, ¶¶ 27, 33.

Plaintiff's appeals for temporary single cell status and for further medical care, were denied by defendants W.D. Pannel, J. Arthur, J. Silva, E.A. Reyes, Linda L. Rianda, and Mike Knowles. Complaint, pp. 11-19. Plaintiff seeks declaratory and injunctive relief and money damages.

From Order, filed on December 2, 2004, pp. 5-7.

\\\\\

\\\\\

3

1  Motion for Summary Judgment

2         Defendants move for summary judgment on the grounds that 1) there are no

3  material facts in dispute and defendants are entitled to summary judgment as a matter of law; and

4  2) defendants are entitled to qualified immunity.

5               *Legal Standard for Summary Judgment*

6         Summary judgment is appropriate when it is demonstrated that the standard set

7  forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . .

8  there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment

9  as a matter of law."  Fed. R. Civ. P. 56(c).

10        Under summary judgment practice, the moving party

11       always bears the initial responsibility of informing the district court
         of the basis for its motion, and identifying those portions of "the
12      pleadings, depositions, answers to interrogatories, and admissions
         on file, together with the affidavits, if any," which it believes
13      demonstrate the absence of a genuine issue of material fact.

14  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the

15  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

16  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

17  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

18  after adequate time for discovery and upon motion, against a party who fails to make a showing

19  sufficient to establish the existence of an element essential to that party's case, and on which that

20  party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete

21  failure of proof concerning an essential element of the nonmoving party's case necessarily

22  renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be

23  granted, "so long as whatever is before the district court demonstrates that the standard for entry

24  of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

25         If the moving party meets its initial responsibility, the burden then shifts to the

26  opposing party to establish that a genuine issue as to any material fact actually does exist.

1  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356

2  (1986). If the moving party meets its initial responsibility, the burden then shifts to the opposing

3  party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

4  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  In

5  attempting to establish the existence of this factual dispute, the opposing party may not rely upon

6  the allegations or denials of its pleadings but is required to tender evidence of specific facts in the

7  form of affidavits, and/or admissible discovery material, in support of its contention that the

8  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n.

9  11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

10  might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby,

11  Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec.

12  Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the

13  evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool

14  v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

15          In the endeavor to establish the existence of a factual dispute, the opposing party

16  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

17  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

18  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

19  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

20  genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

21  56(e) advisory committee's note on 1963 amendments).

22          In resolving the summary judgment motion, the court examines the pleadings,

23  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

24  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

25  477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts

26  placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S.

1    at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the

2    opposing party's obligation to produce a factual predicate from which the inference may be

3    drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

4    aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

5    party "must do more than simply show that there is some metaphysical doubt as to the material

6    facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

7    nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S.Ct.

8    1356 (citation omitted).

9            On October 24, 2002, the court advised plaintiff of the requirements for opposing

10   a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

11   F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v.

12   Eikenberry, 849 F.2d 409 (9th Cir. 1988).

13                    *Eighth Amendment - Failure to Protect*

14           Under the Eighth Amendment, prison officials have a duty to protect prisoners

15   from violence at the hands of other inmates; a prison official's deliberate indifference to a

16   substantial risk of harm to an inmate violates the Eighth Amendment.  Farmer v. Brennan, 511

17   U.S. 825, 827, 833, 114 S.Ct. 1970, 1974 (1994).  To succeed on a claim of deliberate

18   indifference to the threat of serious harm or injury by another prisoner, plaintiff must

19   demonstrate that the deprivation of his rights was "objectively, sufficiently serious."  Id. at 834,

20   114 S.Ct. at 1977.  When the claim is predicated upon the failure to protect, the deprivation is

21   deemed to be sufficiently serious if there was a substantial risk that the prisoner would suffer

22   serious harm.  Id.  The prisoner must also demonstrate that the defendant had a "sufficiently

23   culpable state of mind."  Id.  The prisoner must demonstrate that the defendant knew of and

24   disregarded an excessive risk to his safety:  "the official must both be aware of facts from which

25   the inference could be drawn that a substantial risk of serious harm exists, and he must also draw

26   the inference."  Id. at 837, 114 S.Ct. at 1979.  "[D]eliberate indifference entails something more

1   than mere negligence...[but] is satisfied by something less than acts or omissions for the very

2   purpose of causing harm or with knowledge that harm will result." Hearns v. Terhune, 413 F.3d

3   1036, 1040 (9th Cir. 2005), quoting Farmer, supra, 511 U.S. at 835, 114 S. Ct. 1970.

4                *Undisputed Facts*

5        A number of facts are undisputed.  Plaintiff was 74 years old at the time of the

6   events at issue and was housed in a cell at Mule Creek State Prison in Facility C, Building 14,

7   Cell 224.  On the afternoon of December 4, 2001, plaintiff spoke with defendant Maldonado, a

8   Second Watch floor officer,[6] as well as non-defendant Ambler, another floor officer, telling them

9   that his cellmate (an individual named Gonzalez) was to be transferred, stating that if another

10   cellmate had to be moved in with him, stating his preferences for a compatible cellmate, which

11   included one who did not smoke and preferably did not snore.  Inmate Covert was a clerk in

12   Building 13, whom plaintiff claims to have spoken with after speaking with defendant

13   Maldonado, alleging that Covert arranged for his own cellmate, named Comer, who did not

14   smoke or snore, to be plaintiff's cellmate, with "transfer slips" filled out and given to Covert that

15   day.  Later on December 4, 2001, Stringfellow was assigned as plaintiff's cellmate.  Plaintiff

16   claims that after Stringfellow moved in with him, he spoke with defendant Scharosch, a

17   correctional officer (C/O), on the morning of what would have been December 5, 2001, saying

18   that inmate Comer rather than Stringfellow should have been moved in with plaintiff, and asking

19   defendant Scharosch to make the change.

20        A little before midnight on the night of December 5, 2001, Stringfellow turned on

21   the cell's bright light, lowered the "courtesy curtain," and was doing something at the sink.

22   Plaintiff tried to go back to sleep by turning on his side and facing the wall, but noticed lights

23   flashing on his eyelids.  When plaintiff rolled onto his back, he noticed that inmate Stringfellow

24

---

25       [6] Although defendants assert in their undisputed fact no. 2 that defendant Maldonado was

26   a Third Watch floor officer, Maldonado states that he was on Second Watch in his declaration. Defendants' Exhibit C, Maldonado Declaration, ¶ 1.

1   had dropped a sheet from his upper bunk, to block the view from the lower bunk and had turned

2   on plaintiff's television.  Plaintiff told Stringfellow it was 12:30 a.m. and a poor time to watch

3   TV because plaintiff had to get some sleep.  Stringfellow took off the head phones he was

4   wearing, pulled back the sheet over plaintiff's lower bunk, and launched himself onto plaintiff

5   and began choking him.  Plaintiff resisted, and Stringfellow stopped for a few minutes, then

6   returned, placed his face close to plaintiff's and said:  "You just don't get it, do you?  Look into

7   my eyes.  I'm 666!"  Stringfellow then bit plaintiff on the lip, jaw, neck and chest.  Plaintiff

8   scratched Stringfellow below his eye.  Stringfellow must have stopped at some point, since

9   plaintiff claims he did not call for help because he believed Stringfellow would attack him again

10  in the time it would take to unlock the door.

11          Around 2:30 a.m., C/O Forsyth (not a defendant), who was taking an institutional

12  count, heard an inmate talking angrily in Cell 224.  When Forsyth arrived at the cell, he saw

13  plaintiff lying on his back in the lower bunk with inmate Stringfellow "in" plaintiff's face.  When

14  Forsyth told Stringfellow to come to the door, Stringfellow said they were "ok," and only came

15  after Forsyth insisted.  C/O Forsyth noticed a scratch on Stringfellow's left cheek and asked how

16  he had gotten it.  Stringfellow refused to tell him and, when Forsyth asked him to move so he

17  could see plaintiff, he refused to do that either.  Forsyth was able to get a glimpse of plaintiff,

18  who appeared to have blood on his upper lip.[7]  After Forsyth finished the institutional count, he

19  called Facility C Sergeant Pietronave around 2:40 a.m.

20          Stringfellow refused to come out of the cell so Sgt. Pietronave (not a defendant)

21  got there, so that she could talk to plaintiff.  Pietronave called Lieutenant Shore who told her to

22  take both inmates to the infirmary to be examined by a nurse.  Sgt. Pietronave and C/O Forsyth,

23  joined by C/O's Holm and Kinzel (none of whom are defendants), opened the cell.  While

24

25          [7] In his 12/06/01crime incident report, C/O Forsyth writes, inter alia: "It seemed that
    Stringfellow coerced Smith into saying everything was all right."  Defendants' Exhibit A,
26  Attachment 1, p. 8.

1   Stringfellow seemed agitated and paranoid, C/O Holm managed to get him out of the cell.  Sgt.

2   Pietronave and C/O Holm stayed with plaintiff, while C/O's Forsyth and Kinzel escorted

3   Stringfellow stayed with plaintiff in the cell.  When asked by C/O Holm about injuries to his

4   face, plaintiff said he had cut himself shaving.

5          Once at the dayroom, Pietronave told Forsyth and Kinzel to take Stringfellow for

6   a medical evaluation to the infirmary.  Kinzel told Stringfellow he was going to be handcuffed

7   for the escort, but Stringfellow said he would not let him.  As Kinzel prepared to apply the

8   handcuffs, Stringfellow turned, grabbed Kinzel, and began punching him, which caused Kinzel

9   to fall.  Control Booth Officer, C/O Tsuji (not a defendant), sounded an alarm, after which

10  Stringfellow turned and hit Forsyth, knocking him to the floor.  Pietronave sprayed Stringfellow

11  with pepper spray, but Stringfellow continued to resist.  Holm tried to keep Stringfellow from

12  biting Kinzel.  Stringfellow grabbed Kinzel's pepper spray; Pietronave and Forsyth grabbed

13  Stringfellow's hand to keep him from spraying them.  Stringfellow bit Pietronave on the hand, so

14  she sprayed him again, but he kept resisting.  C/O Forsyth pulled the pepper spray from

15  Stringfellow's hand and sprayed him again, after which Stringfellow finally stopped resisting.

16  He was handcuffed and taken to the infirmary.

17         Plaintiff was treated in the infirmary for his injuries around 5:00 a.m. on

18  December 6, 2001.  Defendant Dr. Bulanon saw plaintiff and gave him at least two 800 mg.

19  tablets of medication for pain.  Plaintiff was x-rayed in February, 2002.  Plaintiff continued to

20  complain of chronic pain.

21         Plaintiff filed a grievance on December 29, 2001, about the attack, asking for

22  single cell status.  Defendants Pannell, Arthur and Silva denied the appeal at the first level.

23  Defendants Knowles and Reyes denied the appeal at the second level.  Defendant Rianda denied

24  the appeal at the director's level.  From defendants' statement of undisputed facts (DSUF) nos.

25  1, 2, 4, 5, 7, 8, 9, 10, 12, 14, 16.

26  \\\\\

1          *Defendants Maldonado and Scharosch*

2          Defendants contend that Maldonado and Scharosch did not fail to protect plaintiff

3   from an unreasonable risk of harm to his safety.  Their motion is in part predicated on the

4   premise that prison officials had no reason to believe that Stringfellow posed an unreasonable

5   risk to plaintiff's safety.  However, as this court has noted before, in their December 13, 2002,

6   Answer,[8] defendants made the following admission: that inmate Stringfellow "had a disciplinary

7   history that made placement with plaintiff improper."  See, Order, filed on December 2, 2004, p.

8   4.[9]  This material fact is not in dispute but weighs more toward an entry of summary judgment

9   for plaintiff than for defendants.

10          The remaining issue with regard to defendants Maldonado and Scharosch is

11   whether they were responsible for Stringfellow's placement with plaintiff and, thus, were or

12   should have been aware of Stringfellow's disciplinary history.

13          Defendants argue that defendant Maldonado was not one of the prison staff who

14   made the decision to house Stringfellow with plaintiff, did not have the authority to make

15   housing assignment changes, and did not do so in plaintiff's case.  Motion for Summary

16   Judgment (MSJ), p. 7.  According to defendant Maldonado, he told plaintiff that he would try to

17   get a cellmate for plaintiff who did not smoke or snore but could not guarantee this.  Defendants'

18   Exhibit (Exh.) C, Maldonado Dec., ¶ 4.  Within his declaration, defendant Maldonado makes the

19   point that prison rules prohibit inmates from smoking in their cells.  Id.

20          Defendant Maldonado concedes that he and C/O Ambler (the other officer with

21   him when plaintiff approached) could make recommendations as to housing assignments to a

22

23          _____

[8] Defendants reference their December 13, 2002, Answer in their motion.  MSJ, p. 4.

24          [9] See, Answer, ¶ 6(E).  While after the court noted the admission in its order, defendants
sought leave to amend their answer, more than two years after it was filed, this court found their
25   grounds for doing so unpersuasive and denied the motion.  See, Order, filed on June 22, 2005.
Upon defendants' request for reconsideration, Judge Karlton affirmed the order of the
26   undersigned.  See Order, filed on August 15, 2005.

correctional sergeant, but asserts that any housing change would have to be approved by a supervisor.  Exh. C, ¶ 3.  Defendant Maldonado then states that C/O Ambler and C/O Richardson signed off on six recommended housing changes to Corr. Sgt. Teague (which included the assignment of Stringfellow to plaintiff's cell), who signed the form for approval by an authorized supervisor.  Exh. C, ¶ 7.  Maldonado also asserts that he has attached to his declaration a copy of the transfer order approving the housing change, but the court cannot locate any such attachment to his declaration.  DSUF no. 5, Exh. C, ¶ 7.  Defendant Maldonado states that while Stringfellow was being considered to be moved in with plaintiff that he had asked him if he was a smoker and Stringfellow had said he was not; Maldonado did not ask if he snored.  Exh. C, ¶ 7.  Defendant Maldonado also declares that after the housing change, plaintiff did not tell him that Stringfellow was a threat to his safety.  Exh. C, ¶ 8.

Within his complaint, plaintiff asserts that he learned that defendant Maldonado had asked Stringfellow whether he smoked in the cells and Stringfellow stated that he did smoke and that Stringfellow told defendant Maldonado this twice.  Complaint, ¶ 19.  Plaintiff asserts that while rules prohibit smoking in the cells, it happens regardless and that defendant Maldonado's response to his request for a mature, non-smoking cellmate who did not smoke was "Well, you can't always get what you want...." id., ¶¶ 16-17, which was why plaintiff attempted to take matters into his own hands by locating a compatible cellmate through the inmate building clerk, an arrangement not approved by prison staff.  Exh. C, § 6.  While he states that plaintiff did not tell him that Stringfellow posed a threat to him (in the very brief period before the attack upon plaintiff) notably absent from defendant Maldonado's declaration is any representation that he was unaware that Stringfellow had a disciplinary history that would make his placement with plaintiff improper.

Defendant Scharosch declares that he does not recall that plaintiff complained to him about inmate Stringfellow being both a heavy smoker and snorer; nor does he recollect refusing to change plaintiff's housing assignment.  Defendants' Exh. D, Scharosch dec., ¶ 3.

11

1   Defendant Scharosch states that he, too, did not have the authority to make a housing change, but

2   could recommend a change to his superiors to accommodate an agreement by inmates to be

3   housed together.  Id.  He states that the change plaintiff states that he requested would have been

4   considered one for the convenience of inmates, thus, as discretionary, and not a move required

5   for medical, security or administrative reasons.  Id.  Discretionary moves, if approved, would be

6   made on week-ends, rather than week-days.  Id.  Defendant Scharosch also does not affirmatively

7   declare that he was unaware of any disciplinary history that would make Stringfellow's

8   placement with plaintiff improper.

9           Plaintiff claims that he approached Scharosch on the morning of December 6,

10  2001, complaining that Stringfellow was a heavy smoker and snorer, and that he should be

11  moved in favor of the other inmate he thought had been approved for transfer (inmate Comer).

12  Complaint, ¶ 20.  Defendant Scharosch refused, stating: "I am not making any convenience

13  moves."  Id.  Plaintiff alleges that the move was not requested for convenience but because

14  smoking gagged him and because, as an elderly prisoner, he needed his sleep, which was

15  interrupted by loud snoring.  Id.

16          Both defendants concede that they could make recommendations as to cellmates

17  and concede that in this case they did not do so.  Defendants have conceded that the placement of

18  inmate Stringfellow in plaintiff's cell was improper in light of his disciplinary history.  Thus, the

19  burden shifts to each of these defendants to demonstrate, at a minimum, that they were unaware

20  of Stringfellow's background.  Neither explicitly denies all awarenessness of problems with

21  Stringfellow's disciplinary background that might make his placement, particularly with plaintiff,

22  an elderly inmate, and, thus, one who was arguably especially vulnerable, inappropriate.

23  Although plaintiff does not provide the basis for his belief that defendant Maldonado was twice

24  told, in contradiction to Maldonado's assertion, that Stringfellow was a smoker, neither does

25  either defendant actually state that Stringfellow (regardless of what he might have said) was not a

26  smoker, nor does Maldonado assert, notwithstanding the rules, that in-cell smoking does not

1  occur.  Although this is not relevant to the actual attack that underlies this complaint, it raises an

2  issue as to Maldonado's credibility.

3         While defendant Scharosch, in making the affirmative statement to plaintiff about

4  not making "convenience moves," according to plaintiff, actually provides support for

5  Scharosch's position that convenience was all that was at issue, and not any imminent threat to

6  plaintiff's safety, both defendants miss the key issue.  Whether or not, plaintiff requested an

7  inmate who would not beat him to a pulp, and rather focused on issues uppermost in his mind,

8  i.e., smoking and snoring, if defendants were aware of a disciplinary history that made

9  Stringfellow a risky placement, they cannot be absolved of all responsibility on this showing,

10  regardless of whether or not either signed off on the placement.

11         *Qualified Immunity*

12         Neither is defendants' argument that they are entitled to qualified immunity as to

13  claims for money damages availing.  The threshold inquiry in a qualified immunity analysis is

14  whether a state official violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201, 121 S.

15  Ct. 2151 (2001).  If he officially violated a constitutional right, the court conducts the following

16  two part inquiry to determine if they are entitled to qualified immunity:  1) was the law governing

17  the state official's conduct clearly established; and 2) under that law could a reasonable state

18  official have believed his conduct was lawful?  Estate of Ford v. Ramirez-Palmer, 301 F.3d

19  1043, 1050 (9th Cir. 2002).

20         For purposes of this analysis, the court will find that defendants violated

21  plaintiff's constitutional rights by failing to recommend that Stringfellow, whom defendants have

22  acknowledged was improperly placed in plaintiff's cell in view of Stringfellow's disciplinary

23  history, not be placed in plaintiff's cell and/or by failing to remove Stringfellow from plaintiff's

24  cell.  Turning to the next step of the qualified immunity analysis, the court finds that the law was

25  clearly established regarding a prison official's duty to protect inmates from harm at the hand of

26  other inmates.  The final question is whether under that law, a reasonable prison official would

1   have believed his conduct was lawful.

2            With respect to this last inquiry, it is necessary to focus upon the Ninth Circuit's

3   explanation of Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151 (2001):

4            An officer might correctly perceive all of the relevant facts but
             have a mistaken understanding as to whether a particular amount of
5            force is legal in those circumstances.  If the officer's mistake as to
             what the law requires is reasonable, however, the officer is entitled
6            to the immunity defense.

7            Id. The converse also is true:
             Officers can have reasonable, but mistaken, beliefs as to the facts
8            establishing the existence of probable cause or exigent
             circumstances, for example, and in those situations courts will not
9            hold that they have violated the Constitution.

10           Id.
             Fourth, and perhaps most important for the present discussion, the
11           Court chided us for taking a minimalist view of our role in
             reviewing a ruling on summary judgment:
12
             The approach the Court of Appeals adopted--to deny summary
13           judgment any time a material issue of fact remains
             on the excessive force claim--could undermine the goal of
14           qualified immunity to "avoid excessive disruption of government
             and permit the resolution of many insubstantial claims on summary
15           judgment."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct.
             2727, 73 L.Ed.2d 396 (1982).
16
             Id. at 2156.  The Court did not suggest that we lacked jurisdiction
17           to consider the defendant's appeal, but instead held that we
             deferred too much to the district court's conclusion that an issue of
18           fact precluded summary judgment.  Indeed, the Court has
             instructed us that the defendant "was entitled to qualified
19           immunity" and has returned the case to us to ensure dismissal of
             the claim. Id. at 2160.  It is true that motive was not an issue in
20           Saucier, but jurisdiction, as ever, was.

21   Jeffers v. Gomez, 267 F.3d 895, 909-910 (9th Cir. 2001) quoting at length from Saucier.

22           Thus, the Supreme Court has found that even taking all facts as stated in the

23   complaint or motions as favoring the plaintiff for purposes of establishing the potential

24   Constitutional violation, the courts can still determine *on summary judgment* that any mistakes

25   made by the officer were reasonable under the circumstances, and the Ninth Circuit has

26   confirmed the Supreme Court's approach in cases where motive or state of mind is at issue.

1   Notwithstanding, here defendants have conceded that, due to his disciplinary history, inmate

2   Stringfellow was improperly placed in plaintiff's cell.  Defendants seek to shelter themselves

3   with the argument that they could have reasonably believed that they were not violating

4   plaintiff's right to be protected because other correctional staff had determined that he could be

5   safely housed with Stringfellow and plaintiff's only stated objection to Stringfellow was that he

6   smoked and snored.  Reply, pp. 11-12.  In light of defendants' admission of improper placement

7   of Stringfellow, notwithstanding the argument of the motion and supplemental motion, this court

8   is unable to discern whether a reasonable officer would have been on notice as to the risk to

9   plaintiff in this set of circumstances.  Defendants cannot impute to plaintiff knowledge that could

10  or should reasonably been within their purview, or that of other prison officials (the risk posed by

11  Stringfellow), above and beyond any complaint as to his habits plaintiff might make.  On this

12  showing, this court finds that neither defendant is entitled to qualified immunity.

13          The court will now address the arguments with respect to those defendants against

14  whom plaintiff alleges an Eighth Amendment violation with respect to medical care, or lack

15  thereof, related to his injuries.

16                      *Eighth Amendment - Inadequate Medical Care*

17          In order to state a § 1983 claim for violation of the Eighth Amendment based on

18  inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

19  deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct.

20  285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively

21  serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter,

22  501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir.

23  1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference."

24  Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

25          A serious medical need exists if the failure to treat a prisoner's condition could

26  result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

15

that a prisoner has a serious need for medical treatment are the following:  the existence of an

injury that a reasonable doctor or patient would find important and worthy of comment or

treatment; the presence of a medical condition that significantly affects an individual's daily

activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900

F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01

(9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other

grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

   In Farmer v. Brennan, supra, 511 U.S. 825, 114 S. Ct. 1970, the Supreme Court

defined a very strict standard which a plaintiff must meet in order to establish "deliberate

indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979.

Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

   It is nothing less than recklessness in the criminal sense—a subjective standard—

disregard of a risk of harm of which the actor is actually aware.  Id. at 838-842, 114 S. Ct. at

1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837,

114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at

847, 114 S. Ct. at 1984.  "[I]t is enough that the official acted or failed to act despite his

knowledge of a substantial risk of serious harm."  Id. at 842, 114 S. Ct. at 1981.  If the risk was

obvious, the trier of fact may infer that a defendant knew of the risk.  Id. at 840-42, 114 S. Ct. at

1981.  However, obviousness per se will not impart knowledge as a matter of law.

   Also significant to the analysis is the well established principle that mere

differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

1   Amendment violation.  Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon,

2   662 F.2d 1337, 1344 (9th Cir. 1981).

3           Moreover, a physician need not fail to treat an inmate altogether in order to violate

4   that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.

5   1989).  A failure to competently treat a serious medical condition, even if some treatment is

6   prescribed, may constitute deliberate indifference in a particular case.  Id.

7           Additionally, mere delay in medical treatment without more is insufficient to state

8   a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766

9   F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is

10  no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing

11  Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-

12  1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends

13  to provide additional support for a claim of deliberate indifference; however, it does not end the

14  inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the

15  medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those

16  needs, the more likely it is that a plaintiff has established deliberate indifference on the part of

17  the defendant."  McGuckin, 974 F.2d at 1061.

18          Superimposed on these Eighth Amendment standards is the fact that in cases

19  involving complex medical issues where plaintiff contests the type of treatment he received,

20  expert opinion will almost always be necessary to establish the necessary level of deliberate

21  indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there

22  may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the

23  treatment he received equated with deliberate indifference thereby creating a material issue of

24  fact, summary judgment should be entered for defendants.  The dispositive question on this

25  summary judgment motion is ultimately not what was the most appropriate course of treatment

26  \\\\\

for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence, criminally reckless.

### *Defendant Bulanon*

Defendants contend that defendant Bulanon was not deliberately indifferent to plaintiff's serious medical needs and that plaintiff's allegations rest on a difference of opinion that plaintiff had with regard to the appropriate treatment of his injuries.  MSJ, pp. 8-9.

Plaintiff claims to have spent several hours handcuffed, isolated in a holding tank in severe pain, terrified and having trouble breathing before being escorted to the exam room to be superficially examined by defendant Bulanon.  Complaint, ¶¶29-30.  Defendants themselves attest to the fact that plaintiff was seen for treatment at about 5:00 a.m. on December 6, 2001.  See DUSF no. 10, citing defendants' Exh. B, Susan Gabler Dec., authenticating plaintiff's medical records, attachment 1 (B-1).  As all parties agree that the attack was ended by around 2:30 a.m., this would constitute a delay of about two to two and half hours before plaintiff received any medical attention.

Plaintiff alleges that he believed that, at 74, he had sustained, during nearly a two-hour attack, debilitating, even life-threatening injuries, including a stroke, paralyzing his left upper torso, left arm and shoulder.  Complaint, at ¶¶31-32.  He alleges chest pain and feeling as if he had fractured ribs.  The right side of his upper torso was weakened to the point of having difficulty lifting a cup of coffee with one hand.   A very hard punch to the jaw caused stiffness and soreness.  He sustained severe bites to his lip, left and right jaw area and upper chest. Cumulatively, these injuries have caused plaintiff substantial pain and discomfort; he suffers from sleeplessness and anxiety and has yet to have had an EKG, all of which he claims arises from defendant Bulanon's deliberate indifference to his medical needs.  Id., at ¶ 32.

All parties agree that defendant Bulanon saw plaintiff, giving him at least two 800 mg. tablets of medication for pain.  Id., ¶ 30; DUSF no. 10.  Defendants produce plaintiff's medical records, however, indicating that plaintiff was seen by a nurse first, to whom he

18

1  explained "my cellie went berserk," and who noted: (1) a gash 1/4 to 1/3 inch deep on plaintiff's

2  lip and questioned whether sutures might be needed; (2) a 1/4 to 1/3 inch long cut under

3  plaintiff's chin; (3) a bite on plaintiff's chest. Defendants' Exh. B-1, p. 3. The nurse also noted

4  red marks on plaintiff's neck and right ear which plaintiff said Stringfellow had caused by

5  grabbing him. Id. Plaintiff complained of pain in both shoulders. The nurse cleaned plaintiff's

6  wounds and he was given a tetanus shot. Id. Later on the same day, defendant Bulanon ordered

7  800 mg. q.i.d. of Keflex for ten days and two tablets b.i.d. of Percogesic for one week, id., at p.

8  22. Defendants cite the complaint (p. 30) in their DUSF no. 10, as the source for Bulanon's

9  having told plaintiff he neither required stitches or further treatment.

10         Plaintiff's medical records indicate that plaintiff was subsequently seen by a nurse

11  on December 12, 2001, and complained that the pain medication was not working, that his left

12  rib area was sore and he was getting worse each day, along with numerous complaints about

13  aches and pains arising from his cellmate's attack. Exh. B-1, p. 2. As defendants note in DUSF

14  no. 11, the nurse called Dr. Douglas (not a defendant) who ordered Motrin 800 mg., b.i.d., for ten

15  days and an x-ray of plaintiff's left rib cage for the following day, which did not show a rib

16  fracture, but did "show prominent degenerative changes and anterior and anterolateral ....

17  osteophytic spurring" at the lower thoracic and upper lumbar levels." Exh. B-1, pp. 22, 31.

18         In his complaint, plaintiff alleges that it was not Dr. Bulanon but Dr. Busi (not a

19  defendant) who ordered x-rays of his upper torso in February, 2002 (with no reference to the

20  December 12, 2001, treatment), but that plaintiff was never advised of the result. Complaint, ¶

21  30. Defendants' medical records for plaintiff show he was seen for a complaint of pain in his

22  ribs and left shoulder, on February 7, 2002, when the attending doctor ordered Percogesic for

23  pain, Flexeril as a muscle relaxant, x-rays, and a consultation with an orthopedic consultant.

24  Defendants' Exh. B-1, pp. 5, 24. On February 21, 2002, x-rays of the shoulders and cervical

25  spine showed a normal right shoulder, degenerative changes in the left acromioclavicular (A/C)

26  region of the left shoulder with spurring of the distal clavicle producing a potential impingement

on the rotator cuff, and narrowing of the left and right biforamen at C5-C6 with lower cervical spondylotic changes and anterior spurring at C4, 5, 6, and 7.  DUSF no. 12, citing Exh. B-1, p. 32.

Plaintiff's medical records show that plaintiff was seen on March 5, 2002, by Dr. Busi for an orthopedic consultation, but he referred plaintiff to Dr. Leahy for an orthopedic consultation.  DUSF no. 13, citing Exh. B-1, p. 21.

Plaintiff continued to complain of chronic pain and, on May 9, 2002, was seen by Dr. Milliman (not a defendant), who treated plaintiff with pain medications, muscle relaxants, and glucosamine chondroitin.  DUSF no. 14, citing Exh. B-1, pp. 6, 25.  Dr. Leary (not a defendant) saw plaintiff, on June 17, 2002, noting plaintiff's right shoulder was normal, there was some degenerative joint disease at the A/C joint, and some narrowing of the foramina at the C5-C6 level.  Id., p. 20.  Plaintiff had limited range of motion in both shoulders in abduction, external rotation, more on the right than the left, tenderness, more on the right, over the rotator cuff and anterior joint space with normal tendon reflexes and sensation.  Id.  It was Dr. Leary's impression that plaintiff had peritendinitis of the shoulders, more on the right than the left, and he believed plaintiff would improve gradually and he limited lifting above the waist at his laundry job.  Id.  He thought plaintiff should take Aleve or Naprosyn to help in getting rid of the inflammatory reaction in the shoulders.  Id.  Naprosyn was prescribed, and physical therapy was prescribed by Dr. Busi on July 15.  Id., at pp. 8, 26.  Nothing in the medical records show that plaintiff suffered a cardiac arrest or that he was paralyzed by inmate Stringfellow's attack.  Defendants' Exh. B-1.

Plaintiff was evaluated by a physical therapist, on September 20, 2002, for his complaints of pain and shoulder weakness, who recommended strengthening exercises.  DUSF no. 15, Exh. B-1, pp. 10, 13-17.

As defendants note in their reply, plaintiff does not dispute the treatment set forth in his opposition.  Although he feared that he suffered a stroke and needed stitches, the medical

1   records do not appear to support that claim.  There is certainly indication in the record that

2   plaintiff complained of a lot of on-going pain from the attack and although another physician

3   might have ordered x-rays on the day that defendant Bulanon saw plaintiff following the attack,

4   and plainly x-rays have been ordered on several occasions since by other physicians, plaintiff

5   does not make out a claim of inadequate medical care on such a basis.  Although plaintiff does

6   not so state in his complaint, it appears that defendant Bulanon did order some pain medication

7   for several days beyond the day that he saw plaintiff and, although plaintiff found it inadequate,

8   his difference of opinion as to the treatment he received is not enough to sustain a claim of an

9   Eighth Amendment violation, based on the medical records.  As noted, supra, mere differences of

10  opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment

11  violation is well-established.  Jackson v. McIntosh, 90 F.3d 330; Franklin v. Oregon, 662 F.2d at

12  1344.  At worst, defendant Bulanon was negligent in not ordering x-rays, but even professional

13  negligence, or malpractice, does not rise to an Eighth Amendment violation.  Defendants' motion

14  for summary judgment as to defendant Bulanon should be granted.

15                    *Defendants Pannell, Arthur, Silva, Reyes, and Knowles*

16                    Defendants argue that defendants Pannell, Arthur, Silva, Reyes, and Knowles

17  were not deliberately indifferent to plaintiff's serious medical needs by denying plaintiff's

18  grievance concerning his medical condition.  The record demonstrates that plaintiff has received

19  adequate medical care.  As this court has found that defendant Bulanon's conduct did not deprive

20  plaintiff of adequate medical care in violation of the Eighth Amendment, it follows that this

21  claim cannot attach to these defendants, who denied plaintiff's grievance related to his medical

22  care.  As to the denial of his request for single cell status, plaintiff has made no showing in his

23  complaint or his opposition that he was placed at further risk in cellmate placement once

24  Stringfellow was removed.  Defendants' motion for summary judgment as to defendants Pannell,

25  Arthur, Silva, Reyes, and Knowles should be granted.

26  \\\\\

1    **Due to the exigencies of the court's calendar, the parties are alerted that the**

2    **objection period as set forth below will <u>NOT</u> be extended.**

3        Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion for

4    summary judgment and supplemental summary judgment, re-noticed on September 16, 2005, be

5    granted in part and denied in part, as follows:

6        1. Granted as to defendants Bulanon, Pannell, Arthur, Silva, Reyes, and Knowles;

7    and

8        2. Denied as to defendants Maldonado and Scharosch, and this action proceed as

9    to these defendants only.

10       These findings and recommendations are submitted to the United States District

11   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

12   days after being served with these findings and recommendations, any party may file written

13   objections with the court and serve a copy on all parties.  Such a document should be captioned

14   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15   shall be served and filed within ten days after service of the objections.  The parties are advised

16   that failure to file objections within the specified time may waive the right to appeal the District

17   Court's order.  <u>Martinez v.  Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

18   DATED: 8/28/06

19                                          /s/ Gregory G. Hollows

20                                          _____
                                           GREGORY G. HOLLOWS
                                           UNITED STATES MAGISTRATE JUDGE

     GGH:009
21   smit1473.msj

22

23

24

25

26